(Decided 16th June, 1891.)

RIVERDALE PARK COMPANY *vs* CHARLES T. WESTCOTT.

*Sale of a Grist and Flour Mill with the Water power Appertaining thereto—Dominant and Servient estate—Right of Purchaser to Restore the Mill dam when Destroyed by a Freshet—Changes made Necessary in such Restoration by Changes in the Bed of the Stream—Rights of the Mill owner as Affected by changes in the Machinery of the Mill—Inadequate remedy at Law—Injunction.*

In the year 1859, C., being then the owner of a grist and flour mill operated by water supplied from a dam built across the eastern branch of the Potomac River, and conveyed to the mill by means of a race; and of the land on both sides of the race and dam; sold and conveyed the mill and ten acres of land adjoin-

Riverdale Park Company *vs.* Westcott.

ing, together with all the buildings and water power appertaining or belonging to said mill seat, to T. whose title under said conveyance became afterwards vested in W. In 1887, the heirs of C. sold and conveyed the land on both sides of the race and dam to S., whose title thereto became afterwards vested in the R. P. Co., and the land was laid off as a site for a town, and streets and avenues were opened and graded, and sewers constructed for the drainage of the same, one of which opened into said mill race. In the year 1889, the dam by which the mill was supplied with water was washed away by a freshet, and W. having built a new dam, the R. P. Co., by its agents and servants attempted to tear down and destroy part of said dam, to prevent which W. applied for and obtained an injunction. On appeal from the order granting the injunction, it was HELD:

1st. That not only the mill, but all its water rights and privileges, thereby including the dam and the race, with the right to maintain a headway of water sufficient to operate the mill, with the capacity it had at the time of the grant, all passed to T. and to those claiming under him, under the deed from C. to T.

2nd. That by the erection of the mill C. himself imposed a burden on one part of his estate in favor of the other, and, when he conveyed the mill and water rights to T., the latter, as to such water rights and privileges, became the dominant owner, and the owner of the land along the race became the servient owner.

3rd. That as by reason of the washing away of the west bank of the stream it had become no longer practicable to connect the new dam with the bank at the precise point at which the old dam connected, W. had the right to extend the west end of the dam higher up the stream, until he found a suitable place to make the necessary connection; such right being absolutely necessary to the beneficial enjoyment of the mill property.

4th. That making the new dam higher than the old one, the bed of the stream having been changed and deepened by recurring freshets, in order to get the same surface level of water, to supply the race, furnished no ground for objection, unless such additional height affected injuriously the rights of the defendant.

5th. That although the plaintiff had no right by increasing the height of the dam thereby to increase the quantity or volume of water beyond the quantity or volume used by the mill at the time of C's grant, he had the right to maintain a dam of a height sufficient to supply the water necessary to operate the mill according to its capacity at the time of the grant.

Riverdale Park Company *vs.* Westcott.

6th. That changes in the machinery of the mill, by the substitution of a turbine wheel for the old overshot wheel, and the change from a burr mill to a roller mill, did not affect the question, unless the quantity of water used by the mill had been thereby increased.

7th. That so long as the plaintiff did not increase the quantity or volume of water, it could not be said that he had imposed an additional burden upon the servient estate.

8th. That although the water in the race might overflow the mouth of the sewer which emptied into it, and though the back-water might overflow to some extent the adjoining land, these were injuries resulting necessarily from the beneficial enjoyment of the water rights and privileges to which the plaintiff was entitled under the deed from C.

9th. That the dam being absolutely necessary to supply the water to operate the mill, and its destruction being the destruction of the beneficial enjoyment of the mill itself, an action at law would not afford an adequate remedy, and an injunction restraining the defendant from tearing away or destroying the dam would properly lie.

APPEAL from the Circuit Court for Prince George's County, in Equity.

The case is stated in the opinion of the Court.

The cause was argued before ALVEY, C. J., MILLER, ROBINSON, BRYAN, and MCSHERRY, J.

*Frank Browning,* and *Richard B. B. Chew,* for the appellant.

The issue of the injunction was erroneous, because the nature of the alleged injury apprehended did not warrant such an extraordinary remedy. The acts threatened amounted at most merely to a trespass, for which the complainant had a plain, full and adequate remedy at law. Even were his right to maintain the dam ascertained by the judgment of a Court of law, an injunction would not

issue as a matter of course. *Adams' Equity,* 211; *Wason vs. Sanborn,* 45 *N. H.,* 169. See *Bassett vs. Salisbury Co.,* 47 *N. H.,* 426.

The restrictions of the use of injunctions are the more remarkable in the New Hampshire cases, because, as appears from the case last cited, the power of the Courts in that State is enlarged by statute authorizing this remedy, "Whenever the same shall be necessary to prevent injustice."

In other jurisdictions, where there is no such statutory extension of jurisdiction, the Courts limit the remedy by injunction to even narrower bounds. Perhaps the most frequently cited case on the subject is *Jerome vs. Ross,* 7 *Johnson Ch.,* 315. See *Shipley vs. Ritter, et al.,* 7 *Md.,* 408, where the cutting of shade trees was enjoined, because such destruction was an injury to the inheritance. In *White vs. Flannigain,* 1 *Md.,* 526, the obstruction of a street was forbidden because it seemed indispensable to the use of an abutting lot.

On the other hand, in *Amelung vs. Seekamp,* 9 *G. & J.,* 468, the Court refused to enjoin the obstruction of a country road, because it did not appear to be fatal to the complainant's use of his property, and he might recover damages for a mere inconvenience. In *Nicodemus vs. Nicodemus,* 41 *Md.,* 529, the defendant who enjoyed a water-right on the plaintiff's land, had undertaken to build thereon a substantial stone culvert for the protection of his mill-race. The Court, while holding that he had no right to impose such an additional burden upon the land, declared that an injunction was not admissible to prevent the same, and remitted the plaintiff to his remedy at law. In *Blaine vs. Brady,* 64 *Md.,* 373, it was held that an injunction would not lie to prevent the defendant from flooding plaintiff's land by an embankment.

In the present case the cutting down of the dam alleged to be threatened by the appellant is evidently not a destruction of the appellee's easement.

Riverdale Park Company *vs.* Westcott.

Even a total razure of the dam would not amount to that, but would be at most only a trespass, the results of which would be repaired, and for which damages, if legally recoverable, would be complete compensation. The appellant is not charged with a purpose to divert the stream. The alleged purpose, if carried into effect, would be only an interruption of the appellee's enjoyment of a disputed right.

The parties in granting easements are presumed to contract with reference to the condition of the property at the time of sale, and its use then fixes the limits of the easements. *Lapman vs. Wilks*, 21 *N. Y.*, 505. See *Jennison vs. Walker*, 11 *Gray*, 426. The condition of the premises, and the manner of using the easement at the time of its origin, fixes the easement and defines its limits. *Simmons, et al. vs. Cloonan, et al.*, 47 *N. Y.*, 3; *Shaw vs. Etheridge*, 3 *Jones*, (*N. C.*,) 300; *Wardle vs. Brocklehurst*, 1 *Ellis & Ellis*, 1058; *Burwell vs. Hobson*, 12 *Grattan*, 322; *Nicodemus vs. Nicodemus*, 41 *Md.*, 529.

The purchaser of the mill is entitled to the use of the dam as it was formerly used. *Ely vs. Stewart and Speed*, 2 *Md.*, 408; *Kilgour vs. Ashcom*, 5 *H. & J.*, 82. The extent of user cannot be increased nor the manner of user varied. A right-of-way for carriages does not give a right of drift way for cattle. *Ballard vs. Dyson*, 1 *Taunton*, 279. Right-of-way to a wood lot for the purpose of taking off fuel, does not justify use of the way for other purposes. *Atwater vs. Bodfish*, 11 *Gray*, 152. A right to corrupt water for one purpose, does not warrant its corruption for another purpose. *Holsman vs. Boiling Spring Bleaching Co.*, 1 *McCarter*, 346.

If a dam be removed from one tenement to another, the right of flowage does not become appurtenant to the new location, but the identity of the easement is destroyed and the prescription fails. *Carlisle vs. Cooper*, 4 *C. E. Green*, (*N. J.*,) 260; *Burnham vs. Kempton*, 44 *N. H.*, 90; *Sunth vs. Russ*, 17 *Wisconsin*, 227.

There can be no question that Dodd and Spicer undertook to change the dam they acquired as an incident or appurtenant to the mill, making it several feet higher and placing it farther up the branch, and then Duckett, against the earnest protests and to the utter disregard of the defendant's rights, and destruction of its property, has undertaken further to change the dam.

This, in the light of the past decisions of this Court and of other standard authorities, cannot be done. *Angell on Watercourses, p.* 537, *sec.* 363, and authorities herein cited; *Jennison vs. Walker,* 11 *Gray,* 426; 2 *Washburn on Real Property,* 325; *Angell on Watercourses, p.* 278, *sec.* 157; *Butler vs. Hume,* 63 *Maine,* 447; *Goodrich vs. Longley,* 4 *Gray,* 379; *Angell on Watercourses, p.* 546, *sec.* 380, *note.*1; *Griffin vs. Bartlett,* 55 *N. H.,* 119; *Carlyle vs. Cooper,* 4 *C. E. Green,* 260; *McCollum vs. Germantown Water Co.,* 54 *Pa. St.,* 48; *Lockwood Co. vs. Lawrence,* 77 *Maine,* 319; *Ely vs. Stewart and Speed,* 2 *Md.,* 419; *Kilgour vs. Ashcom,* 5 *H. & J.,* 82; *Nicodemus vs. Nicodemus,* 41 *Md.,* 529.

A dam, like a private way, is an interest or easement in land and can only be acquired by deed duly executed and recorded. *Baltimore and Hanover R. R. Co. vs. Algire,* 63 *Md.,* 323; or by prescription.

The occupation of the bed of the stream by the present dam, its extension across the washout, (instead of the construction of a wall to take the place of the west bank as it stood before the washout,) the flowage of the water over the washout, and against the bank of the stream above the old ford, are new easements which cannot be permanently acquired except by grant, or in the exercise of the right of eminent domain. They cannot be appropriated to suit the convenience or supposed necessity of a claimant. They are a forceful invasion of the defendant's riparian ownership. *Mayor, &c. of Balto. vs. Appold,* 42 *Md.,* 456, 457, '58, '59; *Stein vs. Burden,* 29 *Ala.,* 127;

*Wright & Rice vs. Moore, et al.*, 38 *Ala.*, 594, 596; *Cooley on Constitutional Limitations*, 544, 547; *Baltimore and Potomac R. R. Co. vs. Magruder*, 34 *Md.*, 79.

*Charles T. Westcott*, and *Marion Duckett*, for the appellee.

The change from overshot to turbine wheel, and from burr flour to roller flour, can do defendants no harm, unless in so doing the appellee is drawing more water than at the time of the grant. *Warner vs. Cushman*, 82 *Maine*, 168; *Carlton Mills Co. vs. Silver, et al.*, 82 *Maine*, 215.

What was conveyed by Charles B. Calvert to Taylor, under the expression, "all the water power appertaining or belonging to said mill seat, and the right to clean out and repair the race leading to said mill, provided the same be done without injury to the adjoining property?" Those rights which the Court may construe this deed to give, are either vested by the subsequent grants as aforesaid, in the plaintiff or if not those rights are not in the defendant. In construing a deed the Court places itself, as nearly as possible, in the situation of the contracting parties; and their intent will be ascertained in the same manner as in the case of any other contract. This grant does not read all *the dam* then existing for the use of the said mill, nor a dam of any prescribed height, length, width or manner of construction, but "all the water power." Can it be supposed that Calvert, who received $11,000 of Taylor's money, meant to convey, and Taylor to accept a dam with any specific limitations, both knowing full well the act of God might destroy the next day this *fixed and specific thing*, and that without possibility of restoration within such limitations. Calvert and Taylor were both practical millers and the former an engineer. Both well knew the character of the stream, its sandy bottom, its sandy banks and its sandy adjacent

lands. The idea, therefore, of a dam prescribed in its structure was to them absurd.

If the grant of "a mill" carries the use of the water by which it is worked, the flood gates, dam and *all things necessary for its use, a fortiori* does the grant of a mill, "with all the water power appertaining thereto." The necessity of the mill for its full and free enjoyment, controls in the matter of what and how much shall pass as an incident, appurtenant to what is in terms granted. 3 *Washburn on Real Property*, 389; *Voorhees vs. Burchard*, 55 *N. Y.*, 102.

Calvert meant that Taylor should have a sufficient headway of water to operate the mill, with the capacity it then had, and the use of his, Calvert's, land at or near the head gate of the race, upon which to rest, construct and maintain a dam, (the means by which this head of water was to be raised) leaving the details to time and circumstances, with no other limitation than that Taylor, as Calvert says, should so use these means as to do as little damage to his, Calvert's adjoining lands as possible; but this limitation should not conflict with Taylor's right to the full use and enjoyment of "all the water power" necessary successfully to operate his mill.

Whatever rights Taylor and Berry might have asserted against Calvert after the deed was made, the appellee may now assert against the appellant, the remote grantee of Calvert. This result follows from the fact that Calvert, the common grantor, while owning the whole estate, subjected that to which the appellant has succeeded to a burden in favor of that which, by a prior conveyance, has come to the appellee. Since the grant of a right carries with it of necessity, all the incidents and privileges connected with the right granted, which are necessary to its enjoyment, the grantees of Calvert, near and remote, acquired as against him and all who stand in his place, the right to maintain a dam of the

*efficient height* to hold back water, so as to produce a head
or power equal to that which was rightfully appurtenant
to the mill at the time of the conveyance referred to.    It
is of no consequence whether the head customarily main-
tained was by one method or the other.    The right
granted was the efficient head or water power which had
become appurtenant to the mill.    The grant related to
the thing, and not the means by which it was produced.
*Lammott vs. Ewers,* 106 *Indiana,* 310.

It is not necessary the dominant and servient estates
should be in contiguity.    *Washburn on Easements,* 83,
sec. 3; *St. Anthony Falls, &c. Co. vs. Minneapolis,* 43 *North
Western Rep.,* 56.

Calvert had by his previous use imposed a burden on
one part of his estate in favor of the other.    The right
to continue this burden was one which he had the power
to grant.    It passed with his grant of the mill and the
water rights appurtenant to it.    *Lammott vs. Ewers,* 106
*Ind.,* 310; *Green vs. Collins,* 86 *N. Y.,* 246; *St. Anthony
Falls, &c. Co. vs. Minneapolis,* 43 *N. W. Rep.,* 56.

Where during the unity of title, an apparently per-
manent and obvious servitude is imposed upon one part
of the estate in favor of another, which at the time of
the severance is in use, and is reasonably necessary for
the fair enjoyment of the other, then upon a severance
of such ownership, either by voluntary alienation or
judicial proceeding, there arises, by implication of law,
a grant or reservation of the right to continue such use.
*Addison on Torts,* sec. 121, *note* 1; *Nicodemus vs. Nico-
demus,* 41 *Md.,* 529; *Janes vs. Jenkins,* 34 *Md.,* 10.

Where a mill has been erected on a stream and has
stood there and been worked for a period of twenty years,
it gives to the mill owner a right that the water shall
continue to flow to and from the mill in the same manner
in which it has been accustomed to flow during all that
time.    The owner is not bound to use the water in the

same precise manner, or apply it to the same mill; if he were, that would stop all improvements in machinery. *Addison on Torts*, (1881,) 182, *sec.* 161, *c.* 80, 81; *Angell on Watercourses, secs.* 203, 204.

A water right which has been used with a mill, together with all secondary easement, will pass by a grant of the mill without the word appurtenances. An injury to the race is an injury to the mill. *Kilgour vs. Ashcom*, 5 *H. & J.*, 82; *New Ipswich Factory vs. Batchelder*, 3 *N. H.*, 190; *Janes vs. Jenkins*, 34 *Md.*, 1; *Cherry vs. Stein*, 11 *Md.*, 1; *Angell on Watercourses, sec.* 159, *note* 1.

To establish a prescriptive right it is not necessary a dam should be on the same spot. It is sufficient to show it has been maintained on the same mill site, though removed from time to time to different places on such site. *Angell on Watercourses, sec.* 383 *a*, 384 *and* 153; *Curtis vs. Smith*, 35 *Conn.*, 158.

In *Stackpole vs. Curtis*, 32 *Maine*, 383, the points were as to the place and height of dam. The proof showed the dam was not on the same place, but on the same site. The Court said, "Grant does not restrict the defendants to the use of the water at one particular place, (mill being in the same place) nor does it restrict the defendant to a flow by a dam standing at a particular place, and hence the grantee is not necessarily restricted to the use of water at the precise place where it was used when the grant was made."

In estimating what is a reasonable use of water power by a mill owner, usage and the state of mechanical and manufacturing advances are to be considered. *Gould vs. Boston Duck Co.*, 13 *Gray*, 442.

The answer to the objection of a want of jurisdiction in the equity Court to grant the injunction and make it perpetual, aside from general principles, and a vast array of common law authorities, is found in the Act of 1888, chapter 260, which provides that "No Court shall refuse

to issue an injunction on the mere ground that the party asking for the same has an adequate remedy in damages." This is a wise and fixed law, as the books are full of equity causes of a meritorious nature lost by the application of the old common law principle.

A suit at law might result in compensation for the destruction of plaintff's dam, but this would only be for the *one act*. What would prevent the defendant, after reparation of the dam, from again destroying it? What again could be a more permanent injury to the plaintiff's mill than a destruction of the dam? It being tantamount to the destruction of the property *or* freehold itself. Injunction seems to be the only process effectually available in this class of cases. See *High on Injunctions*, (1874,) *p*. 315, *secs*. 563, 564; *Webb vs. Portland Manufacturing Co.*, 3 *Sumner*, 189; *Wall vs. Cloud*, 3 *Humphrey*, 181.

ROBINSON, J., delivered the opinion of the Court.

The appellee is the owner of a grist and flour mill operated by water, supplied from a dam built across the eastern branch of the Potomac River, and conveyed to the mill by means of a race. The mill and the land on both sides of the race and dam belonged originally to George B. Calvert. In 1859 Calvert sold and conveyed the mill and ten acres of land adjoining, "together *with all the buildings, water power, appertaining* or belonging to said *mill seat*, to George W. Taylor, under whom the appellee claims.

In 1887—nearly thirty years after the Taylor grant— the heirs of Calvert sold and conveyed the land on both sides of the race and dam to one Lutz under whom the appellant claims. The land thus conveyed to Lutz and by Lutz to the defendant, has been laid off as a site for a town, and streets and avenues have been opened and graded, and sewers constructed for the drainage of the

Riverdale Park Company *vs.* Westcott.

same, one of which empties into the mill race of the appellee.

The dam by which the mill was supplied with water, was washed away by the great freshet of 1889, and, the plaintiff having built a new dam, the defendant, by its agents and servants, attempted to tear down and destroy part of said dam, to prevent which an injunction was granted by the Court below. The new dam, the defendant contends, is not built on the site of the old dam, its west end connecting with the bank higher up the stream. Besides, it is higher, it is said, than the old dam, *thereby increasing the quantity and volume of water*, and causing it to overflow the mouth of the sewer which empties into the race, to the great damage of the appellant.

The record is quite a large one, containing the testimony of no less than thirty witnesses, all of whom were examined, cross-examined, and re-examined at great, and it seems to us, rather unnecessary length. The *real question*, however, is a narrow one, and one, too, about which there cannot be, it seems to us, any difficulty. The rights of the parties to this controversy, depend solely upon the construction of the deed from Calvert to Taylor, by which he conveyed to the grantee the mill and all the water rights appertaining or thereto belonging. So not only *the mill*, but all its *water rights and* privileges, thereby including the *dam and the race, with the right to maintain a headway of water sufficient to operate the mill, with the capacity it had at the time of the grant*, and which the proof shows to have been fifty barrels of flour a day, *all passed under the Calvert deed to Taylor, and to those claiming under him.* By the erection of the mill Calvert himself imposed a burden on one part of his estate in favor of the other, and when he conveyed the mill and water rights to Taylor, the latter as to such water rights and privileges, became the *dominant owner*, and the owner of the land along the race became *the servient owner*.

As to this there can be no controversy. But the appellant's contention is that in rebuilding the dam the appellee has extended its west end higher up the stream, and that the dam itself is higher than the old dam. Without attempting to review the somewhat conflicting testimony in regard to the appellant's contention, it is sufficient to say, that it establishes beyond controversy, that the west end of the dam does in fact extend and connect with the bank higher up the stream than the old dam. But this, it appears, was absolutely necessary by reason of the washing away of the west bank of the stream. The same freshet that washed away the dam, washed away also the *west bank of the stream*, and it became *necessary*, therefore, to extend the west end of the new dam higher up, in order to connect it with the bank of the stream. As matter of fact, the record shows that during the forty years since the execution of the Calvert deed, the successive owners of this mill property, have been obliged, in rebuilding the dam, to extend its west end further up the stream in consequence of the washing away of the west bank. And this was done without objection on the part of Calvert, the grantor, or his heirs, thus showing the construction of the parties themselves, as to the water rights of the owners of the mill property. The dam is absolutely necessary to supply the mill with water, and, if it is washed away by storms and freshets, the right of the owner of the mill to rebuild it, is not, and cannot be, questioned. And if by reason of the washing away of the west bank of the stream it is no longer practicable to connect the new dam with the bank at the precise point at which the old dam connected, he has, it is equally clear, the right to extend the west end of the dam higher up the stream, until he finds a suitable place to make the necessary connection. To deny this right would be to deprive the owner of the mill of the *water rights absolutely necessary* to the *beneficial* enjoyment of the mill property.

To impose upon him the burden of building a *stone wall* in the place of the bank thus *washed* away, as was suggested in argument, would be a most unreasonable construction as to his water rights and privileges under the Calvert deed.

Passing then from this objection to the dam because of its location, we come to the objection which was urged with so much force, as to the height of the dam. Upon this point, too, there is a good deal of conflicting testimony. But, conceding for the proposes of this case, that it is somewhat higher than the old dam, it cannot be said that the mere *height of the dam itself* affects injuriously the rights of the appellant. The proof shows that the bed of the stream has been somewhat changed and deepened by recurring freshets; and, if this be so, the dam must be built higher in order to get the same surface level of water to supply the race, for the race, after all, supplies the necessary headway of water for operating the mill. By increasing the height of the dam the appellee has no right, we agree, *thereby to increase* the *quantity* or *volume of water* beyond the quantity or volume of water used by the mill at the time of the Calvert grant. And this seems to us to be the real question in this case. And as to this question the appellant has wholly failed in proving that either the quantity or volume of water has been increased by the erection of the present dam. All the witnesses agree that the forebay of the race is the *absolute test or measure as to the quantity of water used in operating the mill,* and they all agree that the *forebay* is in the *same place, with the same width and depth, and that it does not and cannot now* draw any *more water* than it did when Calvert himself owned the mill. And further than this, the proof shows that this mill, with a *capacity of fifty barrels of flour a day,* has now, with the present dam, a headway of water barely *sufficient to grind thirty barrels,* and that with a less headway of water it would be im-

possible to operate the mill at all. If this be so, then there is an end of this controversy, for no one can question the right of the appellee to maintain a dam of a height sufficient to supply the water necessary to operate the mill according to its capacity at the time of the grant.

A good deal was said about the substitution of a turbine wheel for the old overshot wheel, and the change from a burr mill to a roller mill. But these changes in the machinery of the mill do not affect the question, for the reason that the proof shows that the quantity of water used by the mill has not been thereby increased. And, so long as the appellee does not increase the quantity or volume of water, it cannot be said that he has imposed an additional burden upon the servient estate. And, though the water in the race may overflow the mouth of the sewer which empties into it, and though the back water may overflow to some extent the adjoining land, these are injuries resulting necessarily from the beneficial enjoyment of the water rights and privileges to which the appellee is entitled under the Calvert deed. If this be so, there can be no question as to the right of the appellee to the writ of injunction. The dam was absolutely necessary to supply the water to operate the mill, and its destruction meant the destruction of the beneficial enjoyment of the mill itself. An action at law would not, under such circumstances, afford an adequate remedy. If the dam was rebuilt, the appellant might again destroy it, and there would be no end to this litigation. An injunction restraining the appellant from tearing away or destroying the dam was therefore a proper remedy.

*Decree affirmed.*

(Decided 16th June, 1891.)